**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| STERLING R. RIVERS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 3:15 C 00108 |
| | ) | Hon. Marvin E. Aspen |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is Petitioner Sterling R. Rivers' motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Rivers asserts he received ineffective assistance of counsel during the sentencing phase of his underlying criminal case. Rivers first alleges his appointed counsel, Jeffery S. Frensley, failed to file a notice of appeal after he was instructed by Rivers to do so. Second, Rivers alleges that based on deficient advice from his appointed counsel, he involuntarily entered into a sentencing agreement that included an appeal waiver.

We held an evidentiary hearing on Rivers' claims on March 27, 2017. Rivers and Frensley both testified at the hearing. Rivers also presented the testimony of his private investigator, Clata Renee Brewer, who he alleged was present at a meeting with Rivers and Frensley during which Frensley allegedly gave Rivers flawed advice regarding his likely sentence and chances of success on appeal. Counsel was appointed to represent Rivers at the hearing pursuant to Rule 8(c) of the Rules Governing § 2255 Proceedings for the United States District Courts. Based on the evidence presented at the hearing, the arguments of counsel, and the parties' briefs, we make the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

A.     **Procedural Background**

Rivers' motion seeks to invalidate the sentence imposed after his conviction for various crimes related to his participation in a drug trafficking conspiracy. (*See* M.D. Tenn. Case No. 11 CR 194–13 ("Crim. Dkt.").) In the underlying criminal case, Rivers was named in a 17-defendant indictment in 2011. The Court appointed counsel to represent Rivers, but after four attorneys withdrew, Rivers sought leave to proceed to trial pro se. (*See* Crim. Dkt. Nos. 592, 603.) The Court reserved ruling on Rivers' motion and ordered a competency evaluation. (Crim. Dkt. No. 619.) On December 28, 2012, following a competency report and a hearing, the Court found Rivers competent to stand trial, granted his motion to represent himself at trial, and appointed standby counsel to assist him. (*Id.*) The same day, Frensley filed notice of appearance as standby counsel on Rivers' behalf. (Crim. Dkt. No. 1015.)

After a ten-day trial, the jury returned a verdict on September 10, 2013. Rivers was convicted on seven counts, including conspiracy to distribute and possession with intent to distribute crack cocaine and cocaine; possession of a firearm with an obliterated serial number; and sale of a firearm to a convicted felon. (Crim. Dkt. No. 1755.) The jury found Rivers not guilty on four counts, and they could not reach a verdict on one count, which the government later dismissed. (Crim. Dkt. No. 1612.)

Frensley continued to serve in his capacity as Rivers' standby counsel following trial, including attending Rivers' presentence interview. The initial presentence report was completed on November 19, 2013. Frensley met with Rivers in person to review the report in detail. Frensley also helped Rivers draft anticipated objections to the report. After reviewing the objections Frensley prepared, Rivers authorized Frensley to engage in negotiations with the

government to potentially reach a sentencing agreement.  At that time, Rivers also asked

Frensley to act on his behalf as his attorney from that point forward.[1]

      Frensley negotiated extensively with the government to reach a sentencing agreement.

Frensley and Rivers met at least 13 times between November 2013 and the sentencing hearing on

January 28, 2014 to discuss sentencing issues, including the presentence report, the sentencing

agreement and its terms, and the negotiations with the government.[2]  The parties eventually

executed an Agreement Related to Sentencing and Waiver of Rights (the "Agreement") on

January 16, 2014.  (Crim. Dkt. No. 1754 (filed under seal).)

---

[1] The Court addressed this issue at the sentencing hearing in order to confirm that Rivers no longer waived his right to counsel and was represented by Frensley:

> During the course of the trial, Mr. Rivers represented himself.  Mr. Frensley was standby counsel, did a wonderful job.  And I'm a little confused where we are on that process now.  The agreement relating to sentencing refers to Mr. Frensley as counsel, and he is assigned as counsel.  So what I really want to do, Mr. Frensley, is establish whether you have segued from standby counsel to counsel for Mr. Rivers, or whether you are still in the standby counsel mode.

(Sentencing Hrg. Tr. (Crim. Dkt. No. 1983) at 3–4.)  In response, Frensley confirmed,

> I was serving as standby counsel through the course of the trial.  After the trial concluded, and upon conviction, I had additional conversations with Mr. Rivers, and at that time he advised me of his desire for me to step into the role as counsel.  In that capacity, I negotiated with [Assistant United States Attorney] Boucek, communicated with the probation officer preparing a presentence investigation report, fulfilled essentially all the functions I normally would as counsel in that capacity and proceeding today [sic], and obviously signed the agreement as counsel on behalf of Mr. Rivers.

(*Id.* at 4.)  Rivers also confirmed at the March 27, 2017 evidentiary hearing that he asked Frensley to represent him at some point after receiving the presentence investigation report and before the sentencing agreement was executed.

[2] Although Rivers testified he met with Frensley "not more than" three times to discuss the sentencing agreement, to the extent there is a dispute, we find Frensley's testimony, which is based on his review of his billing records, more credible.

The Agreement incorporated and agreed to the guideline computations set forth in the revised presentence report. (*Id.* ¶ 7.) The revised presentence report calculated a Total Offense Level of 43 and Criminal History Category III, resulting in a guideline range of life imprisonment. (*Id.*) However, the Agreement provided that it was the intent of the parties that the Agreement should be treated in the same manner as an agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), "[t]hat is, the parties have agreed, giving consideration to the facts and circumstances of the case and the factors set forth in 18 U.S.C. § 3553(a), that the sentence imposed by the Court shall include a term of imprisonment of 336 months (28 years) in the custody of the Bureau of Prisons." (*Id.* ¶ 8.) In addition, Paragraph 12 of the Agreement, titled "Waiver of Appellate Rights," stated:

> Pursuant to this agreement, and in exchange for the government's sentencing recommendation contained herein, the defendant hereby waives all rights to appeal, except for those expressly maintained below. The defendant also waives all rights to file any post-trial motions, including but not limited to a motion for new trial or motion for judgment of acquittal. Defendant also waives the right to challenge his conviction and the sentence imposed in any collateral attack, including, but not limited to, a motion brought pursuant to 28 U.S.C. § 2255 and/or § 2241, and/or 18 U.S.C. § 3582(c). However, no waiver of the right to appeal, or to challenge the adjudication of guilt or the sentence imposed in any collateral attack, shall apply to a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel. Likewise, the government waives the right to appeal any sentence imposed in accordance with this agreement.

(*Id.* ¶ 12.) The Agreement also provided that Rivers separately entered into a settlement and agreed to dismiss two related pending civil actions he was litigating against the government. (*Id.* ¶ 9.)

In advance of the January 28, 2014 sentencing hearing, Frensley filed a sentencing position and the Agreement under seal. (Crim. Dkt. Nos. 1743, 1743–1 (filed under seal).) In response, the government filed its sentencing position stating the "United States concurs with the analysis set forth in Docket Entry No. 1743, and in light of the terms of the sentencing agreement

set forth in Docket Entry No. 1743–1, a sentence of 336 months (28 years) in the custody of the Bureau of Prisons is sufficient, but not greater punishment than necessary."

(Crim. Dkt. No. 1750.) During the sentencing hearing, the parties again signed and dated the Agreement, and the Court reviewed it "with Mr. Rivers under oath to make sure he understands it and that he wants to agree to it." (Sentencing Hrg. Tr. at 11.) Before Rivers was sworn in at the sentencing hearing, the Court explained:

> Mr. Rivers, before the Court can accept this agreement, it has to be determined that it's being done knowingly, intelligently and voluntarily. In order to do that, I need to ask you some questions, and I will be going over the agreement with you to make sure you understand it. The questions will need to be under oath. It's very important that you tell the truth. If you don't tell the truth, you could be prosecuted for perjury or false statement.

(*Id.* at 13.) The Court reviewed and read each paragraph in the Agreement, and Rivers testified under oath that he understood each paragraph and had no questions. (*Id.* at 13–20.) Rivers also testified that he was acting voluntarily, he was not forced to enter into the Agreement, and he was not "pressure[d] . . . in any way" to sign it. (*Id.* at 20–21.) The Court accepted the Agreement and found Rivers understood its consequences and "offered to enter into it knowingly, intelligently, and voluntarily." (*Id.* at 21–22.)

Rivers was sentenced according to the terms of the Agreement to a total of 28 years imprisonment. (Crim. Dkt. Nos. 1753, 1755.) Rivers was advised during the sentencing hearing of his right to file an appeal notwithstanding the Agreement's appellate waiver:

> I need to inform you about your right to appeal. I'm going to ask the Court Officer to share this notice of appeal form with you. Mr. Rivers, you have 14 days to file a notice of appeal. If you are unable to pay the cost of an appeal, you can apply to appeal as a pauper. If you so request, the Clerk of the Court will file a notice of appeal on your [behalf]. If you direct your lawyer in clear terms to file a notice of appeal, he will file one. And again, you can apply to appeal as a pauper if you cannot afford it. Having said all of that, your agreement relating to sentencing at Paragraph 12 waives certain rights to appeal. This type of waiver is generally enforceable, but if you believe somehow it's not enforceable, you can present that to the Court of Appeals for its consideration.

So again, the bottom line is 14 days to appeal. And you can apply to appeal as a pauper. You can use that form if you want, but you should use it with the advice of counsel.

(Sentencing Hrg. Tr. at 40–41.)

B. **Rivers' § 2255 Motion**

Rivers filed the instant § 2255 motion on February 3, 2015. In support of his motion, Rivers submitted his own affidavit attesting to his recollection of the events at issue. (Jan. 28, 2015 Rivers Aff. (Dkt. Nos. 1–1, 42–1).) He also presented the affidavit of his private investigator. (Sept. 18, 2014 Brewer Aff. (Dkt. Nos. 1–1, 42–2).) The government opposed the motion, and filed the affidavit of Frensley in support. (Mar. 4, 2015 Frensley Aff. (Dkt. Nos. 13–1, 41–1).) On March 27, 2017, we held an evidentiary hearing on Rivers' claims. Prior to the hearing, the parties submitted direct testimony declarations and supplements thereto, along with a pretrial order and supplemental pretrial order that included a statement of the facts and legal issues to be decided. (Dkt. Nos. 41–43, 45–47.) Rivers, Brewer, and Frensley were presented for live cross examination and rebuttal testimony at the evidentiary hearing. In addition, Rivers submitted a supplemental brief in support of his motion on April 4, 2017. (Dkt. No. 50.) The government responded on April 11, 2017. (Dkt. No. 52.) Although permitted to do so, Rivers elected not to file a supplemental reply brief. (*See* Dkt. No. 49.)

1. Rivers Affidavit and Evidentiary Hearing Testimony

Rivers' affidavit states that on September 19, 2013, he met with Frensley at Robertson County Detention Facility,[3] and Frensley presented him with a sentencing agreement offered by

---

[3] Rivers' affidavit indicates that the meeting took place at the "Robinson County Detention Center," but the parties have otherwise consistently indicated that Rivers was being held at the Robertson County Detention Facility in Springfield, Tennessee.

the government.[4]  (Rivers Aff. ¶ 2.)  Rivers attested that Frensley told him that "the government

would agree to capping [his] future federal sentence to 336 months of imprisonment," and in

exchange, Rivers would need to "drop" the civil lawsuits and "waive [his] statutory appellate and

habeas corpus rights, except in limited circumstances."  (*Id.*)  Rivers "told Mr. Frensley that I

wanted to appeal my conviction and sentence because I had went through the long process of

exercising my rights to a jury trial."  (*Id.*)  Rivers' affidavit also states "[r]ight after sentencing, I

told Mr. Frensley that I wanted him to file a notice of appeal.  Mr. Frensley asked me was I sure.

I told him I was sure and to please file the notice because 28 years was too long in prison."

(*Id.* ¶ 3.)

Rivers also swore that during the same meeting, Frensley told him that he would lose on

appeal.  (*Id.* ¶ 2.)  When Rivers asked "how he could know that without research and going

through the process of reviewing appeal issues,"  Rivers claims Frensley told him "the appellate

judges were 'old white men' who would not go against another white judge for a young black

man" and "that is just how it is."  (*Id.*)  According to Rivers, Frensley also said he would get a

life sentence if he didn't accept the sentencing agreement.  (*Id.*)  Rivers alleges that Brewer was

---

[4] The government's response to his motion observed that the meeting could not have taken place on September 29, 2013 because Rivers' initial presentence report was not completed until November 2013.  (Dkt. No. 13.)  Rivers later disclosed that he would testify that the meeting took place in January 2014.  (Dkt. No. 42 at 1–2.)  At the evidentiary hearing on his § 2255 motion, Rivers and Brewer testified for the first time that the meeting took place on January 19, 2014, which is three days after the date the Agreement was first executed.  Rivers testified that "the visitation lady at the jail, Ms. Taylor or Ms. Jones" provided incorrect information to Brewer.  Rivers claimed he found out that the date of the meeting was incorrect a few weeks after he submitted his affidavit on February 3, 2015, but he never filed anything with the court, nor alerted the government of this fact until, via counsel, he filed his proposed direct testimony declarations on March 3, 2017.  For his part, Frensley does not recall any meeting with Rivers and Brewer taking place after sentencing, and he testified that it would have been highly unusual given Brewer's involvement as an investigator had ended after trial.  Frensley also testified it would have been inconsistent with his practice to discuss sentencing issues with Brewer present.

present for part of the meeting with Frensley. (*Id.*) She questioned and objected to the sentencing agreement offer and made it clear that she thought it was a bad idea. (*Id.*) Rivers claims Frensley "reasserted and stressed" that Rivers would "almost certainly" receive a life sentence and lose on appeal "because the white appellate judges would not rule in [Rivers'] favor simply because [he] was black and the district judge was white." (*Id.*) Rivers alleged that "[w]ithout this advice from Mr. Frensley I would have not accepted the sentencing agreement and waived my rights to appeal my case or drop my lawsuit." (*Id.*)

At the March 27, 2017 evidentiary hearing, Rivers testified under oath. He agreed that he had vigorously defended himself, including filing dozens of pleadings on his own behalf while he was representing himself before, during, and after trial. Rivers understood before signing the Agreement that he could receive a maximum penalty of life imprisonment, and he affirmed that he agreed to a term of imprisonment of 28 years at least in part to avoid the risk of receiving a life sentence. Rivers nevertheless maintained his claim that he only entered into the Agreement because Frensley told him he would lose on appeal because the appellate judges and the district court judge were white and Rivers was black.

However, Rivers also conceded that despite performing research and filing numerous pleadings throughout the pretrial and trial proceedings, he did no research to determine whether Frensley's advice was accurate. He claimed he took Frensley at his word, trusted the advice of his attorney, did not believe he received bad advice at the time, and did not know how to do proper research himself even if he wanted to. He admitted that although he went through four attorneys leading up to trial and did not take their advice, he believed what Frensley told him without question. Rivers also testified that Frensley's advice allegedly "broke his spirit" and caused him to sign the Agreement. Under this version of events, Rivers testified that he did not

reach out to the Court to try to get a new lawyer, because he had previously tried to recuse the judge and did not feel that his request would be treated fairly.

Further, although Rivers testified that he "definitely" would not have signed the Agreement but for Frensley's alleged advice, he also conceded that he stood to gain from the Agreement—namely, it ensured he would not get a life sentence—and he could not say that averting the risk of a life sentence had no influence on his decision to sign it. Additionally, Rivers testified that even though he purportedly believed Frensley's advice that he would lose an appeal, and despite signing the Agreement waiving his appellate rights, he still planned to appeal so that others could "see what was going on" with his case. When asked why he did not forego the Agreement in order to proceed with an appeal, he testified he planned to file his appeal regardless, stating "I wanted my cake and I wanted to eat it too." He could not explain why he swore under oath at the sentencing hearing that he was entering into the Agreement voluntarily, claiming "I just said what they wanted me to say. And I had to say it." He testified that he had decided before he signed the Agreement that "28 years was too long" and he did not "want to do none of that."

Contrary to his affidavit, Rivers testified that following the sentencing hearing, he asked Frensley to file a notice of appeal, but they were interrupted and Frensley never responded. In particular, Rivers testified that as he was being escorted from counsel's table by law enforcement, he instructed Frensley to file an appeal. He was then interrupted by Assistant United States Attorney Braden Boucek, who asked Rivers a question. Rivers stopped to talk to Boucek and Frensley kept walking. Rivers testified Frensley never responded to his request to file an appeal, and Rivers never confirmed or asked Frensley about it again. Rivers agreed that he understood at the time that he had only 14 days to file a notice of appeal, but he never reached

9

out to Frensley to ask about the status of his appeal. Rivers conceded that Frensley had otherwise "done everything that I asked him" up to that point.

### 2. Brewer Affidavit and Evidentiary Hearing Testimony

Rivers engaged Brewer as a private investigator with the permission of the Court in order to assist him with pretrial investigation and trial preparation. Brewer's affidavit states that she was present at the meeting with Frensley on September 19, 2013. (Brewer Aff. at 1.) Like Rivers, at the evidentiary hearing, Brewer testified that the meeting in fact took place on January 19, 2014 at Robertson County Detention Facility—Brewer testified that she confirmed as much because she traveled to the jail, had them "pull the books" and check the sign-in records to determine when she and Frensley visited at the same time. At the evidentiary hearing, she blamed the mistake on her "failing health" at the time she drafted the affidavit. Brewer also testified that she believed that the meeting on January 19, 2014 was the first time the sentencing agreement was proposed to Rivers. However, as the Agreement was final and executed on January 16, 2014, we find Brewer's testimony is contradictory and not credible.[5]

Brewer alleges she arrived at the jail visitation room after Frensley had already begun speaking with Rivers. (*Id.*) Rivers explained that "they are trying to make me take a deal." (*Id.*) When Rivers told her the details, Brewer responded, among other things, "[n]o way man[] I would drop a 7 million dollar law suit [sic] for 28 years," and "28 years that's your whole damn life with no chance for appeal sounds crazy [sic]." (*Id.*) Brewer stated she urged Frensley to engage in further negotiations with the government to try to get a lower sentence. (*Id.*) Brewer

---

[5] Following the evidentiary hearing, Rivers filed a letter raising certain concerns with his appointed counsel's performance in preparing Brewer for the hearing. (Dkt. No. 51.) Rivers also filed a supplemental affidavit of Brewer following the hearing, in which Brewer claimed she "failed in [her] duties to properly prepare [her] testimony" for the evidentiary hearing. (Dkt. No. 53.) As set forth herein, we need not rely on Brewer's testimony to resolve Rivers' claims, and we accordingly decline to address the issues Rivers has raised as they are immaterial.

claimed she suggested to Frensley that she believed there were valid grounds for an appeal, and she raised other concerns regarding alleged trial issues.[6]

According to Brewer, Rivers told Frensley he did not "want a deal, I want to appeal my case." (*Id.* at 2.) Brewer claimed Frensley told Rivers he would receive a sentence of "life or the equivalent of life," and if he filed an appeal, the sentence would be upheld because "these are old white judges at the circuit Court [sic] and they will not take the side of a young black man over their colleague." (*Id.*) Brewer also alleged Frensley said Rivers would receive a life sentence "because this judge is known for handing out maximum fines" and Rivers "has put the court to all this effort." (*Id.*) On cross examination, Brewer denied that Frensley said anything about Rivers' race. When pressed as to why her testimony that Frensley never raised the issue of race was contrary to her affidavit, Brewer explained that it had "been awhile" and she may have "forgotten that part." She also testified that she did not research or follow up after the meeting to determine whether Frensley's alleged advice was accurate, although she conceded it would have been easy to do so.

Brewer's affidavit also states that she pleaded with Rivers to wait before accepting the sentencing agreement and offered to find him a different attorney,[7] but Frensley told Rivers he was on a deadline and if Rivers "doesn't accept this deal it will be taken of[f] the table." (*Id.*)

_____

[6] Brewer's affidavit is rambling, and it includes accusations and speculation about the government's investigation and prosecution that Brewer apparently conveyed to Frensley during the alleged meeting. As they are irrelevant to Rivers' § 2255 motion, we do not address them.

[7] Brewer's description of her role as an "investigator" and her apparent emotional involvement in Rivers' case is atypical of the function of a court-appointed advisor. Examples include her admonishing Rivers not to "drop a 7 million dollar [civil] law suit," (Brewer Aff. at 1), and offering to find a replacement attorney for Rivers (*id.* at 2–3). The demeanor of her testimony at trial was more of the nature of zealous advocate than that of an investigative fact seeker, all of which undermined the credibility of both her affidavit (made at a time when she testified her health was "failing") and her testimony at the hearing before the Court.

She testified that she recalled Rivers saying he wanted an appeal, but he did not have time and was anxious to get out of the jail, where he did not have a law library. Brewer testified that she thought Frensley was doing his job and trying to get his point across, but she was upset and left the meeting. She tried to find Rivers an attorney for his civil lawsuits, but when she checked back with Rivers 10 days later, she learned he "already took the deal."

        3.      <u>Frensley Affidavit and Evidentiary Hearing Testimony</u>

The government opposed Rivers' motion, and submitted the affidavit of Frensley in support. Frensley affirmed that after the presentence report was completed on November 19, 2013, he met with and asked Rivers whether he was interested in discussing with the government "the possibility of reaching some sort of post-trial sentencing agreement" in order to avoid a potential life sentence. (Frensley Aff. ¶ 4.) After several conversations, Rivers agreed to allow Frensley to communicate with the government about a sentencing agreement. (*Id.* ¶ 5.) Thereafter, Frensley engaged in extensive negotiations with the government and frequently met with Rivers in person to discuss the terms being discussed, the government's position, and Rivers' strategy. Frensley also testified that once the Agreement was drafted, it was his practice to review it with his client line by line, and word by word, stopping to address any questions after each section.

Frensley denies Rivers' allegations that he used "racial implications" to force Rivers to execute the sentencing agreement, and stated such claims are "both nonsensical and untrue." (*Id.* ¶¶ 7, 11.) He testified that he did not have a specific recollection of the meeting Rivers and Brewer alleged took place on January 19, 2014. Frensley averred he "does not believe that race plays any role in sentencing or appeal considerations," and therefore he would not have made the racially-charged statements Rivers alleges. (*Id.* ¶¶ 11–12.) He further asserted that the possibility that Rivers would receive a life sentence "had absolutely nothing to do with race or

Judge Campbell's reputation," and was instead based "solely upon the guideline calculations in the presentence report and the fact that the government would argue that a guideline sentence is appropriate as is consistent with their position within every single sentencing hearing in the Middle District of Tennessee."  (*Id.* ¶ 12.)

Rather, he advised Rivers that "he did not believe that the sentencing judge would impose a life sentence, but because the probation office had calculated a guideline range of life and the government would in all probability request the guideline sentence, Mr. Rivers would need to be aware that it was certainly a possibility that he could receive a life sentence."  (*Id.* ¶ 15.) Frensley testified that he and Rivers discussed the guideline calculations in the presentence report on multiple occasions, and he believed Rivers understood the calculations and the risk of receiving a life sentence.  While he could not recall specifics, Frensley also testified that he would have discussed with Rivers the applicable procedure and expected arguments should he proceed to a contested sentencing hearing.  Frensley advised Rivers that, while he thought it unlikely, he could not promise that Rivers would not receive a life sentence.  He advised Rivers that there were factors that counseled against the likelihood he would receive a life sentence, including that Rivers' criminal history was not extreme and there were no career criminal enhancements.  However, due to the guidelines calculation and in light of certain evidence— including Rivers' own statements—admitted at trial showing he was involved in significant gang activity, violent crimes, and drug-related crimes, a reasonable possibility existed that he could receive a life sentence.

With respect to Rivers' chances on appeal, Frensley affirmed that he discussed with Rivers that the "likelihood of Mr. Rivers obtaining relief on appeal was very small."  (*Id.* ¶ 15.)

Frensley also stated that the race of the defendant or sentencing judge would have "absolutely no impact on his appeal," and instead, Frensley's

> opinion that it was unlikely that Mr. Rivers would be successful on appeal was based upon the absence of any significant issue for which he could obtain relief; the belief that Judge Campbell had given Mr. Rivers a fair trial, and thus there were no significant evidentiary rulings for which Mr. Rivers could obtain relief; and the statistical reality that a very small percentage of cases on appeal are successful."

(*Id.* ¶ 12.) Likewise, Frensley advised Rivers that any sentence he received would likely be affirmed on appeal due to the standard of review applicable to sentencing issues and because any sentence other than life imprisonment would have been a downward variance and it would accordingly have been difficult for Rivers to obtain additional relief from his sentence on appeal. Frensley also affirmed that he "would have no way of advising Mr. Rivers that he would have a panel of 'white appellate judges' because the panel hearing any appeal would not be known . . . unless and until there was an appeal." (*Id.*) Frensley stated the only context in which he and Rivers discussed race was with regard to jury selection, when Frensley advised Rivers about the process of selecting a jury, exercising preemptory challenges, and the principles set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). (*Id.* ¶ 14.) He also testified that he was aware that during the course of the underlying criminal case, Rivers had concerns about race and the fairness of the proceedings, but Rivers never raised any concerns about the fairness of an appeal based on the race of the appellate judges.

Frensley further testified that the appellate waiver was the most important term of the Agreement, and it was discussed immediately with the government. The government was unwilling to enter into any agreement if it did not contain a waiver, because in exchange for the below-guidelines sentence, the government required finality. Throughout the negotiations, Frensley communicated to Rivers that the appeal waiver was a critical component of the agreement for the government, and he took steps to ensure Rivers understood the effect and

consequences of assenting to the waiver. Frensley testified that it was Rivers' right to decide to enter into the Agreement, and he did not do anything to try to influence that decision other than attempt to secure the most favorable resolution for him, and provide explanation and advice. Frensley testified that he was particularly careful to ensure Rivers understood and was comfortable with the appellate waiver, as Frensley had served as standby counsel during the trial and knew that Rivers had vigorously defended himself at trial.

Frensley further asserted that after several discussions, Rivers specifically authorized Frensley to enter into the Agreement, and he was "fully aware of the consequences of those actions and knowingly and voluntarily agreed to the terms and conditions set forth in the Agreement including the dismissal of his civil actions and waiver of his appeal rights." (*Id.* ¶¶ 16, 18.) Rivers never conveyed any concerns with the appellate waiver language, though he did express concern with other aspects of the Agreement as it was being negotiated, including the term of incarceration.

Frensley denies that Rivers told him following the sentencing hearing that he wished to file an appeal notwithstanding the terms of the Agreement and Court's acceptance of it at the sentencing hearing. (*Id.* ¶ 18.) He affirmed at the evidentiary hearing that Rivers did not instruct him to file a notice of appeal. He recalled visiting with Rivers in the holding area after the sentencing hearing to discuss their impressions from the proceedings. Frensley testified that he went over Rivers' appeal rights again during this meeting and told Rivers that if he wanted Frensley to file a notice of appeal and instructed him to do so, Frensley would file it in a timely fashion. Frensley further testified that he would have no reason not to file a notice of appeal, irrespective of the appellate waiver language in the Agreement. Frensley testified that he has never failed to file a notice of appeal upon a client's request. He further testified unequivocally

that had Rivers indicated his interest in appealing and instructed Frensley to file a notice of appeal, he would have done so. Additionally, Frensley stated that "[a]t no time subsequent to the sentencing has Mr. Rivers ever raised the issue with [Frensley] regarding the filing of a Notice of Appeal or raised concerns that a Notice of Appeal was not filed in the case." (*Id.*) Frensley testified that had Rivers ever raised the issue with him, he would have made every effort to protect Rivers' appeal rights, including filing an untimely or delayed notice of appeal.

## CONCLUSIONS OF LAW

### I.      STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255, a federal prisoner may petition to vacate or set aside his sentence, among other reasons, "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." In order to succeed, a prisoner seeking relief under § 2255 must show "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *McPhearson v. United States*, 675 F.3d 553, 558–59 (6th Cir. 2012) (quoting *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003)); *see also Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009). The petitioner bears the burden of setting forth facts which entitle him to relief. *Green v. Wingo*, 455 F.2d 52, 53 (6th Cir. 1972). In order to obtain collateral relief under § 2255, "a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166, 102 S. Ct. 1584, 1593 (1982).

### II.      ANALYSIS

Rivers' § 2255 motion includes two claims. First, Rivers claims his appointed counsel was ineffective because he failed to file a notice of appeal despite Rivers' request that he do so. Second, Rivers claims counsel was ineffective because he told Rivers the court would impose a

sentence of life imprisonment if Rivers did not sign the proposed sentencing agreement, and he used "racial implications" to coerce Rivers into entering into the Agreement. Specifically, Rivers argues he was told he would lose on appeal "because the appellate judges were 'old white men' who would not ruled [sic] against their white colleague [district judge] in favor of a young black man." (Mot. at 9–10 (second alteration in original).) Rivers seeks to withdraw from the sentencing agreement and permission for leave to file a direct appeal. (*Id.* at 16.)

We held an evidentiary hearing as Rivers at least presented a factual dispute as to whether he was entitled to relief. *See Pola v. United States*, 778 F.3d 525, 533 (6th Cir. 2015) (finding an evidentiary hearing is required "in order to test and evaluate the apparently conflicting memories and credibility of the two affiants"); *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (explaining that if a habeas petitioner presents a factual dispute, then "the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims"); *Campbell v. United States*, 686 F.3d 353, 360 (6th Cir. 2012) ("[T]he district court must conduct an evidentiary hearing to determine if [the petitioner] in fact expressed the desire for an appeal as he now asserts."); *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (holding an evidentiary hearing is required unless "the record conclusively shows that the petitioner is entitled to no relief").

A.      **Sixth Amendment Right to Counsel**

Criminal defendants have a Sixth Amendment right to a "reasonably effective" attorney. *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 2071 (1984). As a threshold issue, we address whether Frensley was acting in his capacity as standby counsel or whether he was representing Rivers at the time of the relevant conduct. There is no constitutional right to hybrid representation, and thus a defendant who waives his Sixth Amendment right to counsel and tries the case with the assistance of standby counsel ordinarily cannot later argue standby

counsel was ineffective. *See Wilson v. Parker*, 515 F.3d 682, 696–97 (6th Cir. 2008). "By exercising his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel." *Id.* at 696 (citing *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 2540–41 (1975)); *accord. United States v. Ross*, 703 F.3d 856, 882 (6th Cir. 2012) ("To the extent his standby counsel was deficient, [the defendant] 'merely suffered the consequences of his decision to proceed pro se.'"); *Holmes v. United States*, 281 F. App'x 475, 481 (6th Cir. 2008) ("Even if standby counsel failed to act in some manner, such failure is an incidental effect of [the defendant's] decision" to represent himself, "and not the basis of an ineffective assistance of counsel claim.").

Although Frensley was appointed and served as standby counsel through Rivers' trial and the initial stages of the sentencing process, after the initial presentence report was completed on November 19, 2013, Rivers asked Frensley to represent him as counsel. Rivers authorized Frensley, in his capacity as Rivers' attorney, to engage in negotiations with the government on Rivers' behalf to potentially reach a sentencing agreement. Frensley and Rivers confirmed at the January 28, 2014 sentencing hearing and again in their testimony at the March 27, 2017 evidentiary hearing that during the period of time when the parties were negotiating the Agreement, Frensley was no longer appearing as standby counsel, and was instead representing Rivers as his attorney. Accordingly, we conclude that at the time Rivers alleges Frensley acted deficiently, Frensley was acting as Rivers' counsel. Because Rivers was no longer representing himself, he was entitled to the effective assistance of his counsel. *Lafler v. Cooper*, 566 U.S. 156, 165, 132 S. Ct. 1376, 1385–86 (2012) (recognizing that the right to effective assistance of counsel extends to all critical stages of a criminal proceeding, including during sentencing).

B.    **Ineffective Assistance of Counsel**

In order to prevail on an ineffective assistance of counsel claim, Rivers must meet his burden of showing both that counsel's performance was deficient and that he suffered prejudice. *Strickland*, 466 U.S. at 700, 104 S. Ct. at 2071; *United States v. Campbell*, 364 F.3d 727, 730 (6th Cir. 2004). He must first show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064; *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011). Second, he must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* at 686, 104 S. Ct. at 2064; *Ludwig v. United States*, 162 F.3d 456, 458 (6th Cir. 1998). In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *see also Huff v. United States*, 734 F.3d 600, 606 (6th Cir. 2013) ("Judicial scrutiny of counsel's performance must be highly deferential." (quotations omitted)); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) ("Thus, the determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069.

1.      <u>Claim One</u>

Rivers first argues that he received ineffective assistance of counsel because he asked Frensley to file a notice of appeal on his behalf, and Frensley failed to do so. (Mot. at 8; Mem. ISO Mot. (Dkt. No. 1–1) at 3–7.) In support, Rivers relies on his own January 28, 2015 affidavit and his testimony at the March 27, 2017 evidentiary hearing. Rivers argues the evidence supports his claim that immediately following the January 28, 2014 sentencing hearing, he explicitly instructed Frensley to file a notice of appeal, notwithstanding the appeal waiver he consented to in the Agreement.

The Supreme Court has "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477, 120 S. Ct. 1029, 1035 (2000) (citing *Rodriquez v. United States*, 395 U.S. 327, 89 S. Ct. 1715 (1969)); *see also Campbell*, 686 F.3d at 357 (following *Flores-Ortega* and finding an attorney's failure to file a notice of appeal in derogation of a defendant's actual request constitutes a Sixth Amendment violation). "This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes." *Flores-Ortega*, 528 U.S. at 477, 120 S. Ct. at 1035.

The existence of an appeal waiver does not excuse counsel from filing a notice of appeal if explicitly directed to do so. *Campbell*, 686 F.3d at 358 ("[E]ven though a defendant clearly is entitled to waive the right to an appeal by executing a plea agreement, even the broadest waiver does not absolutely foreclose some degree of appellate review."). The Sixth Circuit "hold[s] that even when a defendant waives all or most of his right to appeal, an attorney who fails to file an appeal that a criminal defendant explicitly requests has, as a matter of law, provided ineffective

assistance of counsel that entitles the defendant to relief in the form of a delayed appeal."
*Id.* at 360. Thus, if counsel ignores a defendant's express instruction to file an appeal,
notwithstanding the executed appeal waiver and regardless of the merits of the substantive
claims, the defendant is "entitled to relief under § 2255 if the district court . . . determined that
there was 'an actual request for an appeal.'" *Id.* at 359 (quoting *Ludwig*, 162 F.3d at 459);
*see also Peguero v. United States*, 526 U.S. 23, 28, 119 S. Ct. 961 (1999) ("[W]hen counsel fails
to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his
appeal would likely have had merit.").

However, where the request to file a notice of appeal is not explicit, and where a
defendant has not clearly conveyed his desire to appeal, the Supreme Court has rejected a per se
rule that counsel's performance was deficient, finding it "inconsistent with *Strickland*'s holding
that 'the performance inquiry must be whether counsel's assistance was reasonable considering
all the circumstances.'" *Flores-Ortega*, 528 U.S. at 477, 120 S. Ct. at 1035 (quoting *Strickland*,
466 U.S. at 688; 104 S. Ct. at 2065). Instead, we must "engage in the circumstance-specific
reasonableness inquiry required by *Strickland*." *Id.* at 478, 120 S. Ct. at 1035. The touchstone
of the analysis is whether counsel made objectively reasonable choices. *Id.* at 479,
120 S. Ct. at 1036. We consider factors including "whether the defendant received the sentence
bargained for" and whether the defendant "expressly reserved or waived some or all appeal
rights." *Id.* at 480, 120 S. Ct. at 1036.

First, Rivers has not established that he explicitly instructed Frensley to file a notice of
appeal. Rivers' testimony is inconsistent. He asserted in his affidavit that "[r]ight after
sentencing, I told Mr. Frensley that I wanted him to file a notice of appeal. Mr. Frensley asked
me was I sure. I told him that I was sure and to please file the notice because 28 years was too

long in prison." (*Id.* ¶ 3.)  At the evidentiary hearing, however, Rivers' recollection of his instruction to Frensley was more ambiguous and contradicted his affidavit.  Rivers maintained that after he signed the Agreement, the only time he asked Frensley to file an appeal was at the sentencing hearing on January 28, 2014.  Rivers alleged he instructed Frensley to file a notice of appeal as Rivers was escorted out of the courtroom following the sentencing hearing, but they were interrupted by Boucek.  According to Rivers, he stopped to respond to Boucek, and Frensley continued walking out of the courtroom.  Rivers was taken to a holding room immediately thereafter.  He testified that Frensley never responded to his request to file an appeal.  He also conceded that he never confirmed that Frensley heard his instruction to file a notice of appeal, nor did he ever mention anything about his request to Frensley again.

Frensley has consistently and credibly maintained that Rivers never instructed him to file a notice of appeal.  He testified that he reiterated Rivers' right to file a notice of appeal during their conversation in the holding room immediately following the sentencing hearing, but even then, Rivers never asked him to file an appeal.  Frensley stated that he would have filed a notice if Rivers had asked him to, as he understood the importance of protecting Rivers' appeal rights, he had no reason not to comply with such a request, and he has never before in his more than 20 years of practice failed to perfect an appeal upon a client's request.  Rivers also affirmed that Frensley had never ignored any of Rivers' other requests during his involvement in the case.  Further, in light of Rivers' vigorous defense at trial, and his continued involvement in his case at the sentencing stage, Rivers' claim that he directed Frensley to file a notice of appeal is incredible given he acknowledged he never once followed up with Frensley after his sentencing hearing to reiterate his request or to confirm that Frensley would file a notice of appeal on his behalf.

Thus, considering all the evidence, Rivers has not met his burden of showing he clearly conveyed his wishes to appeal his conviction or sentence. At best, there was miscommunication about Rivers' desire to appeal. Even if Rivers explicitly asked Frensley to file a notice of appeal, the record shows Frensley did not hear the request. To the extent that Rivers' affidavit claimed otherwise, we find Rivers not credible. It is inconceivable that the one and only time Rivers asked Frensley about filing a notice of appeal was during an interrupted conversation while walking out of the courtroom after the sentencing hearing. Accordingly, Rivers has not established Frensley ignored an express instruction to file a notice of appeal.

Although Rivers has failed to establish that Frensley ignored his explicit request to file a notice of appeal, we must nevertheless consider whether Frensely failed to adequately consult with Rivers about an appeal following the sentencing hearing. *Flores-Ortega*, 528 U.S. at 480, 120 S. Ct. at 1036. "[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* In making this determination, we consider all information counsel knew or should have known at the time. *Id.*

Here, all relevant factors weigh in favor of finding Frensley acted reasonably in consulting with Rivers regarding an appeal following the sentencing hearing. Importantly, Frensley testified that following the sentencing hearing, he specifically discussed with Rivers his right to file an appeal notwithstanding the Agreement's appellate waiver and Rivers' affirmation under oath at the sentencing hearing that he was knowingly and voluntarily entering into the Agreement and waiving his appeal rights. Frensley told Rivers that if he wanted to appeal, he

need only instruct Frensley to do so, and he would timely file a notice of appeal.  Rivers never instructed Frensley to appeal, and in light of Rivers' repeated confirmation to both Frensley and the Court that he intended to waive his appeal rights in exchange for a below-guidelines sentence, it was not unreasonable that Frensley did not consult with Rivers regarding an appeal after their meeting in the holding area following sentencing.

In addition, prior to the sentencing hearing, Frensley took appropriate steps to ensure Rivers understood the rights he was giving up in exchange for receiving a below-guidelines sentence.  Frensley met with Rivers in person for more than 25 hours on 13 occasions between November 17, 2013 and January 28, 2014 to discuss issues related to sentencing and the terms of the Agreement.  Rivers further reiterated his understanding of the Agreement and its terms under oath at the sentencing hearing, and he testified that he was knowingly and voluntarily giving up his rights to appeal, as set forth in the Agreement.  Based on the totality of the circumstances known to Frensley, and in light of Rivers' failure to request an appeal following sentencing, he acted reasonably in believing that Rivers did not want to appeal.

Accordingly, we conclude there is insufficient evidence to establish Rivers explicitly instructed Frensley to file a notice of appeal or that he reasonably demonstrated to Frensley a desire to appeal his conviction and sentence.  Likewise, we conclude Frensley's performance under the circumstances was professionally reasonable.  *Flores-Ortega*, 528 U.S. at 479, 120 S. Ct. at 1036 (citing *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066).  Rivers has failed to establish that Frensley provided ineffective assistance by not filing a notice of appeal, and Claim One is therefore denied.

        2.    Claim Two

Rivers' second claim asserts Frensley was ineffective because he "used racial implications to make [Rivers] sign a sentencing agreement."  (Mot. at 10.)  Rivers claims he

entered into the Agreement and acquiesced to the appeal waiver because he relied on flawed advice from Frensley that if he did not do so, he would receive a sentence of life imprisonment. (*Id.*) Rivers further claims he signed the Agreement based on Frensley's assurance that there was "no way" he would win an appeal "because the appellate judges were 'old white men' who would not rule[] against their white colleague . . . in favor of a young black man." (*Id.* at 9–10.) Relying only on Frensley's alleged advice that Rivers would receive a life sentence and he would not succeed on appeal due to "racial implications," Rivers claims he believed he had no choice but to sign the Agreement. He argues that but for Frensley's advice, he would have proceeded to a contested sentencing hearing and would have retained his right to appeal his conviction and sentence.

A habeas petitioner attempting to challenge a guilty plea—or in this case, a post-trial sentencing agreement—based on ineffective assistance of counsel must satisfy the familiar two-part test articulated in *Strickland*. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 368 (1985); *Dando v. Yukins*, 461 F.3d 791, 798 (6th Cir. 2006). The petitioner must show (1) the advice he received from counsel was outside "the range of competence demanded of attorneys in criminal cases," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Hill*, 474 U.S. at 56–59, 106 S. Ct. at 369–70 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). There is "an established deference that is afforded trial counsel in the area of plea bargaining." *Spickes v. Mackie*, 541 F. App'x 637, 648 (6th Cir. 2013 (citing *Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011)).

Rivers' claim fails because, irrespective of whether his allegations regarding Frensley's statements are true, Rivers conceded that he intended to file an appeal whether he signed the

Agreement or not—in effect, he admitted the Agreement was meaningless in his mind, because he "wanted [his] cake and [he] wanted to eat it too." Therefore, by Rivers' admission, nothing counsel said would have mattered in terms of Rivers' decision to appeal. In addition, as set forth above, notwithstanding the Agreement's appeal waiver, Rivers elected not to file a notice of appeal even after being advised that he could do so. Rivers made the decision to appeal, or not to appeal, independent from any alleged advice he received from Frensley. Furthermore, under cross examination, Rivers conceded that other factors affected his decision to enter into the Agreement—most importantly, the fact that he would receive a below-guidelines sentence of 28 years imprisonment. Accordingly, Rivers cannot establish a reasonable probability that he would have proceeded to a contested sentencing hearing or that he would have filed an appeal were it not for Frensley's alleged advice.

This conclusion is further supported by Rivers' own admissions that he was voluntarily and knowingly choosing to forego a contested sentencing hearing and appeal, that he understood the Agreement, and that he had no questions about it. (Crim. Dkt. No. 1983 at 20.) He further affirmed that no one had forced him to sign the Agreement, and no one "put any pressure" on him "in any way" to make him enter into the Agreement. (*Id.* at 20–21.) Rivers' sworn testimony before the Court is entitled to considerable weight. *See Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Toth*, 668 F.3d 374, 379 (6th Cir. 2012) ("Enforcing appeal waivers makes good sense as well. A waiver of appellate rights gives a defendant a means of gaining concessions from the government. The government benefits, too, by saving the time and

money involved in arguing appeals." (citations omitted)).  Accordingly, for the foregoing

reasons, we deny Rivers' Claim Two as he has failed to establish the prejudice element of his

claim.[8]

## CERTIFICATE OF APPEALABILITY

We decline to enter a certificate of appealability.  The Rules Governing Section 2255

Proceedings require that a district court "issue or deny a certificate of appealability when it

enters a final order adverse to the applicant."  Rule Governing § 2255 Proceedings 11(a).

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing

of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  That is, Rivers must make a

substantial showing that "reasonable jurists could debate whether . . . the petition should have

been resolved in a different manner or that the issues presented were 'adequate to deserve

encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 483–84,

120 S. Ct. 1595, 1603–04 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4,

103 S. Ct. 3383, 3394 (1983)).  Specifically, Rivers "must demonstrate that reasonable jurists

would find the district court's assessment of [his] constitutional claims debatable or wrong."

*Id.* at 484, 120 S. Ct. at 1604.  Because we find that no reasonable jurists would differ on our

disposition of Rivers' § 2255 motion, we decline to issue a certificate of appealability.

---

[8] Finally, because Rivers' allegations of unprofessionalism made against Frensley are serious charges, it is important for this Court to reiterate specifically that Frensley's representation of Rivers (as both standby counsel and appointed counsel) exemplified the highest standards of professionalism.  We have found his testimony at this hearing credible and the contrary testimony of Rivers and Brewer lacking any credibility.

**CONCLUSION**

For the foregoing reasons, Rivers' motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 is denied. We also decline to issue a certificate of appealability. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: May 2, 2017
      Chicago, Illinois